708 So.2d 354 (1998)
Sherrie Jean Eddlemon BAILEY
v.
James Marvin BAILEY.
No. 97-C-1178.
Supreme Court of Louisiana.
February 6, 1998.
Rehearing Denied April 3, 1998.
*355 David E. Stone, Alexandria, for Applicant.
Field Vernon Gremillion, III, Alexandria, for Respondent.
LEMMON, Justice.[*]
This is an action to partition community property. The asset at issue at this stage of the proceeding is a retirement account in the name of James Bailey, an employee of the State of Louisiana and a member of the Louisiana State Employees Retirement System (LASERS). The funds in the account were credited by LASERS over a maximum period of three years as part of a deferred retirement plan in accordance with La.Rev. Stat. 11:447-451, the Deferred Retirement Option Plan (DROP) for eligible members of LASERS which allowed payment of earned retirement benefits into a DROP account based on fictitious retirement while the employee continued to work.
At the beginning of, and during part but not all of, the three-year period that LASERS credited funds into the account, Bailey was married to Sherrie Eddlemon Bailey. The principal issue in this court is whether the spouse of a state employee in LASERS' DROP program is entitled to any portion of the DROP account that is attributable to funds credited by LASERS after the termination of the community.

Facts
In July 1977, James Bailey married Sherrie Bailey. Mr. Bailey had been a member of LASERS since 1963. In October 1993, Mr. Bailey opted to participate in LASERS' DROP program, and LASERS credited funds monthly into his DROP account, as described hereinafter, for a period of three years. In the meantime, James and Sherrie Bailey divorced, and the community of acquets and gains formerly existing between the parties was terminated retroactive to January 28, 1994.
At the partition trial, the parties stipulated that Mrs. Bailey was entitled, as of the date Mr. Bailey entered the DROP program, to one-half of 53.65 percent of Mr. Bailey's regular retirement benefits under the formula set forth in Sims v. Sims, 358 So.2d 919 (La.1978), as the non-employee spouse's share of the pension rights attributable to the employee spouse's employment during the existence of the community.
The trial court rendered a judgment partitioning the community property. As to Mr. Bailey's DROP account, the judgment divided the account into two components: (1) that portion attributable to funds credited by LASERS to the account between the date Mr. Bailey entered the DROP program and January 28, 1994, the date the community was terminated; and (2) that portion attributable to funds credited by LASERS to the account after the termination of the community. The judge classified the first portion as community property and awarded Mrs. Bailey one-half of 53.65 percent of that amount. The judge further classified the second portion as Mr. Bailey's separate property.
In an unpublished opinion, the court of appeal affirmed. The court noted that while an employee's entitlement to optional participation in the DROP program is contingent upon past years of service, the program "contemplates that an employee continue working for three years." Slip opinion p. 4. Hence the court concluded that the trial court correctly characterized the disputed portion of Mr. Bailey's DROP account as "earned" after the termination of the community and therefore his separate property.
The dissenting judge reasoned that since an employee's right to participate in the DROP program is based entirely on past participation in the retirement system, the majority improperly focused on the employee's employment while in the DROP program. For purposes of the DROP program, the dissenting judge observed, the employee became a retiree and was entitled to receive retirement benefits at the time he entered the DROP program, and not when he completed the three years in the program. Thus the DROP account was an asset attributable to the employee's employment before the *356 termination of the community, although a portion of the funds were credited to the account after the termination.
On Mrs. Bailey's application, we granted certiorari primarily to consider the res nova question of whether an employee spouse's DROP account, to the extent attributable to funds credited by LASERS after the termination of the community, constitutes the separate property of the employee spouse, or is apportionable between community property and separate property in accordance with the Sims formula. 97-1178 (La.6/30/97); 696 So.2d 996.

Deferred Retirement Option Plan
The DROP program is described by LASERS in its publication to members as follows:
DROP is an optional method of retiring from the Louisiana State Employees' Retirement System (LASERS).... When an employee enters DROP, his status in LASERS changes from active member to retiree, even though he continues working at his regular job. The employee can participate in DROP for up to three years. During his DROP participation, he accumulates money in an individual account based on what he would have received as a monthly retirement benefit. He also continues to earn his regular salary. He can withdraw the money from his DROP account after he ends state employment-either as a lump sum or a series of payments spread out over time.
La.Rev.Stat. 11:447-451 authorize a state employee who is eligible for retirement to participate in the deferred retirement option plan, "[i]n lieu of terminating employment and accepting a retirement allowance." La. Rev.Stat. 11:447 A. Under DROP, an eligible state employee may enroll in the plan and is thereafter "considered by the system to be in a retired status" for the period he or she participates in the program. La.Rev.Stat. 11:448 A. Although the employee continues to work, payments are credited monthly into the employee's DROP account in the amount of the retirement benefits that the employee was eligible to receive if he or she had retired. La.Rev.Stat. 11:448 C. The base amount of the employee's eventual monthly retirement benefits is fixed as of the time he or she enters the DROP program. La.Rev. Stat. 11:448 B. The employee does not receive the funds credited into the account until he or she actually retires, La.Rev.Stat. 11:450 A, but neither does the employee receive any service credit in the calculation of the eventual monthly retirement benefits for the years that the employee continues to work while in the DROP program. La.Rev. Stat. 11:448 B.
As far as LASERS is concerned, the employee is retired and is credited in the DROP account with the amount of retirement benefits that would be due; as far as the employer is concerned, the employee continues to work and receives the salary for work performed; and as far as the employee is concerned, he or she receives the salary for the work performed and receives credit in the DROP account (which is not available to the employee until sometime in the future) for the retirement benefits that would have been paid had he or she retired, but is ineligible during the DROP period for accruing additional credits toward the calculation of either the base retirement benefits or the possible supplemental benefits earnable upon employment after the DROP period ends.
After the period of participation in the DROP program, the employee, if he or she elects to remain in service, begins accruing additional service credit in the calculation of his or her eventual monthly retirement benefits, but such additional credit is in the nature of a supplemental pension, in addition to the base benefits that were fixed at the time the employee entered the DROP program. La.Rev.Stat. 11:450 D.

Parties' Position
Neither party disputes that the portion of the DROP account attributable to funds credited by LASERS to the account before the termination of the community is apportionable in accordance with the Sims formula. The parties differ as to the portion of the DROP account attributable to funds credited by LASERS to the account after the termination. Mr. Bailey contends that since the funds were credited by LASERS only if he continued to work, such credits are a form of *357 incentive earnings and are thus his separate property. Mrs. Bailey, on the other hand, contends that the entirety of the DROP account is a retirement benefit attributable to her former husband's employment prior to or during the existence of the community and that she is entitled to her Sims formula percentage of the entirety of the DROP account.

Community Property Status of DROP Account
The employment and retirement contributions that gave rise to Mr. Bailey's right to have funds credited to the DROP account occurred prior to and during the existence of the community, and not after the termination.[1] It follows then that the right to receive the funds in the DROP account, at least the portion attributable to Mr. Bailey's labor and efforts and retirement contributions during the existence of the community prior to entering the DROP program,[2] constitutes a community asset.
This court addressed the interplay between ordinary retirement plans and community property rights in two seminal cases: T.L. James & Co. v. Montgomery, 332 So.2d 834 (La.1975), and Sims v. Sims, 358 So.2d 919 (La.1978).
In T.L. James, we recognized that deferred compensation earned during the existence of the community accrues to the benefit of both spouses. In Sims, we articulated the following principle:
[A]t the dissolution of the community, the non-employed spouse is entitled to judgment recognizing that spouse's interest in proceeds from a retirement annuity ... when they become payable with the spouse's interest to be recognized as one-half of any payments to be made, insofar as they are attributable to the other spouse's contributions or employment during the existence of the community.
Id. at 922 (collecting cases). We noted that the community interest in the retirement benefits "stems not only from contributions made by community funds, but also by reason of any right to receive proceeds attributable to such employment during the community (i.e., as an asset `acquire[d] during the marriage,' Civil Code Article 2402)," (now La. Civ.Code art. 2338). Id. at 921. We held that although the benefits would not become due until sometime in the future, the non-employee spouse was entitled, at the time of the dissolution of the community, "to have recognized his or her one-half interest in this community asset, i.e., the right to receive payments from employee benefit plans, to the extent (proportion) that these payments result from the employment or contributions during the community." Id. at 923.
Still further, we enunciated in Sims the following formula for calculating the non-employee spouse's interest (in cases in which the employee spouse has not yet retired):
Portion of pension attributable to creditable
service during existence of community × annuity (or lump sum) × ½
---------------------------------------------
Pension attributable to total creditable
service (yet to be determined)
*358 Application of the Sims formula to a DROP account is complicated by the fact that the employee spouse's base retirement benefits are fixed as of the date of entry into DROP and by the fact that the retirement is a fictitious retirement. The fixing of ordinary retirement benefits is deferred until the employee spouse retires and is then divided according to the formula set forth in Sims. In the DROP situation, the employee spouse's election to enter the DROP program operates, as of the date of that election, to fix the base amount of the employee's eventual monthly retirement benefits,[3] and this amount is credited to the DROP account monthly as retirement benefits, although the actual receipt of the funds in that account is deferred until the employee actually retires.
In the case of ordinary retirement benefits, the non-employee spouse's right to share is calculated under the Sims formula as of the date the community terminates, but the exact percentage cannot be fixed until the employee spouse actually retires. In the DROP context, however, the Sims formula must be applied as of the date of the employee spouses's entry into the DROP program, because that is the date the base amount of the eventual monthly retirement benefits is fixed, and the employee spouse earns no further credit toward these retirement benefits while in the DROP program. Significantly, the trial court applied the Sims formula as of the date Mr. Bailey entered DROP, albeit without discussion. Thus the trial court implicitly recognized that Mrs. Bailey's right to share in Mr. Bailey's eventual monthly retirement benefits was fixed as of that date, but then proceeded to treat Mrs. Bailey's right to share in the DROP account as if the funds in that account were attributable to Mr. Bailey's employment after he entered the DROP program. This is where the trial court erred.
If Mr. Bailey had actually retired on the date he entered the DROP program, Mrs. Bailey clearly would have had the right to share, in the stipulated percentage, in the retirement benefits he would have received.[4] The fact that the same amount of monthly retirement benefits was credited to a deferred-receipt account under a fictitious retirement for a specific temporary period should not change that result.
The amount of the base retirement benefits that Mr. Bailey will receive upon actual retirement was fixed as of the date he entered the DROP program. Mrs. Bailey is entitled to her Sims formula percentage of that fixed amount. When Mr. Bailey reentered LASERS upon completion of the DROP program, he began accruing supplemental retirement credits to be added to his base retirement benefits in the eventual calculation of his total monthly benefits when he retires. Mrs. Bailey, of course, is not entitled to any portion of the supplemental benefits he will receive upon retirement, because these benefits are attributable to Mr. Bailey's employment after the termination of the community. But just as Mrs. Bailey is entitled to her Sims formula percentage of Mr. Bailey's base benefits he will receive upon retirement, she also is entitled to the same percentage of his DROP account, inasmuch as both the base retirement benefits and the funds in the DROP account are attributable to Mr. Bailey's employment and retirement contributions prior to the termination of the community.
The statutory provisions governing the DROP program refer repeatedly to the DROP benefits as "retirement benefits" and fix such benefits as of the date of entry into DROP. Moreover, the statutes expressly provide that if an employee elects to remain in state employment after the DROP period, any future retirement credits earned are in the nature of a supplemental pension. La. *359 Rev.Stat. 11:450 D. The latter treatment fully supports our holding that the date of entry into DROP fixes a non-employee spouse's interest in the entirety of the retirement benefits, both the DROP benefits and the regular retirement benefits. Thus we glean no legislative intent to alter a non-employee spouse's right to such retirement benefits by virtue of the employee spouse's opting to participate in the DROP program. We hold that the entirety of Mr. Bailey's DROP account is apportionable between community property and the employee spouse's separate property, in accordance with the Sims formulai.e., 53.65 percent to the community.
Accordingly, that portion of the judgments of the lower courts declaring the funds credited to the DROP account between the date of the termination of the community and the date of the completion of the DROP program to be Mr. Bailey's separate property is set aside. Judgment is rendered declaring these funds to be community property to the extent of 53.65 percent.
CALOGERO, C.J., additionally assigns concurring reasons.
TRAYLOR, J., concurs in part and dissents in part.
CALOGERO, Chief Justice, assigns additional concurring reasons.
As the majority opinion properly notes, the DROP monthly sums received by Mr. Bailey for the thirty-two months following the termination of the community are the only source of dispute in this case. While in DROP, Mr. Bailey continued working for the state at full salary. The DROP sums had been generated by Mr. Bailey's credited service and retirement contributions, all of which took place during the existence of the community. Admittedly, the DROP benefits at issue were received only because Mr. Bailey elected to remain employed by the state and to continue on in the DROP program after the termination of the community.[1]
Nonetheless, the DROP payments were essentially "early" retirement benefits, and the non-employee spouse, Ms. Bailey in this case, is entitled to her Sims formula share. To deny Ms. Bailey her share of the benefits on the premise that the benefits constitute no more than a bonus to the employee spouse for his post-divorce decisions is not only unfair, but in my view, contrary to the non-employee spouse's legal entitlement.
Mr. Bailey asserts that his post-divorce actions, that is, staying in DROP for the thirty-two months post divorce, his continuing to work for the state, and his foregoing the opportunity to get out of DROP and simultaneously commence earning a second or supplemental independently calculated state pension thirty-two months sooner, represent his "contribution" post-divorce, for which he should be rewarded with at least a greater than Sims formula entitlement regarding the thirty-two months of DROP retirement benefits that are in dispute. Although this contention is not entirely without arguable support, in my opinion, it is not of sufficient consequence to change the result reached by the majority, especially since there is a corresponding involuntary sacrifice forced upon Ms. Bailey, the non-employee spouse, when Mr. Bailey entered DROP, as will be noted hereinafter.
The appropriate formula for the fixing of Mr. Bailey's pension amount (here, the monthly DROP amount) includes only thirty years of state service, fourteen of them before the marriage and sixteen of them after the marriage and before divorce. Any change in the Sims formula to include the thirty-two months of Mr. Bailey's post divorce, *360 and post-DROP "contribution" (his staying in DROP for thirty-two months and desisting from accelerating the onset of a second supplemental pension with the state), would entail a credit of a different sort and one unrelated to the creditable state service that went into the formula creating the specific DROP monthly benefits.
Furthermore, these pro-employee spouse "equitable considerations" are offset by the disadvantages to which the non-employee spouse is subjected when the employee spouse enters DROP. First, the non-employee spouse, Ms. Bailey, who in the ordinary case must await the employee spouse's termination of state service and who would be thus, entitled to one-half of 53% of a likely larger pension (the average compensation in the three highest income years preceding final retirement), finds herself, without sharing in the DROP amounts (if Mr. Bailey were to prevail as found in the court of appeal) subjected to the same delay in receipt of her share of the pension, that is until the employee spouse's final retirement, but limited to her share in the pension as fixed at the time the employee spouse went into DROP. This is to say that the non-employee spouse's share, which is fixed when the employee spouse enters DROP and is to be received only after final retirement, is likely less then the non-employee spouse would have received post final retirement on the larger pension the employee would have received at that time but for the employee spouse's entering DROP. In addition to these considerations, surely it is unfair to the non-employee spouse to have the employee spouse calculate the DROP entitlement and alone receive the "early pension" amount, considering that the community years of his state service, which the Sims formula would earmark for the non-employee spouse, are central to the DROP calculation.
An additional consideration is that the choice of Mr. Bailey, the employee spouse, to continue working with the state and remain in DROP for the full thirty-six months is just that, his choice, which enures to his benefit and only coincidentally to Ms. Bailey's benefit as well. For these reasons, I would apply the Sims formula without variance and award the wife one half of 53% of the disputed thirty-two months of DROP benefits. With these additional concurring reasons, I join in the majority's well-reasoned opinion.
TRAYLOR, Justice, concurring in part and dissenting in part.
I concur with the majority to the extent that Mr. Bailey's entire retirement package, both annuity and lump sum, is a community asset which should be partitioned. However, because the majority fails to include all years in which Mr. Bailey contributed to the pension as creditable service, which skews the resulting Sims calculation providing the non-employee spouse an inflated percentage of the pension, I dissent to that portion of the majority opinion.
Mr. Bailey contributed to his retirement package before, during, and after the existence of the marital regime. During the existence of the community, he became eligible for retirement but elected to remain at work and entered the DROP program. At this point, the amount of his future pension annuity distributions was fixed. An amount equal to his monthly annuity disbursements had he retired gathered in a DROP account[1] for a lump sum distribution upon his actual retirement. These DROP funds were collectable only upon termination of his employment and acted to increase his overall retirement package. Thus, the period of time that DROP contributions were made during the community should have been added to the numerator of the Sims formula as a portion of Mr. Bailey's pension attributable to creditable service during the existence of the community and the years Mr. Bailey contributed service to his employer during the DROP program should be treated as part of the total pension attributable to the total creditable service and added to the denominator of the Sims formula.
I disagree with the majority to the extent that it treats Mr. Bailey's entry into the DROP as an actual retirement and stops counting years of employment after this *361 point in the Sims denominator, Mr. Bailey was a retiree only for the purposes of his LASERS status. He remained an active employee in every other sense including, most notably, his obligation to work, along with his receipt of wages and his tax status. This is so because his continued work during the DROP period was a prerequisite to earning the DROP payment.[2] Mr. Bailey's DROP account accrued monthly upon the satisfaction of each month's worth of work. This is simply an alternative way for State employees to receive their retirement pensionin the form of a lump sum/annuity instead of a pure annuity. Mr. Bailey exchanged future increases in his retirement annuity for continued work and a lump sum upon termination, the size was entirely contingent upon his continued service during the DROP period.
I take issue with the majority's assertion that "[t]he employment and retirement contributions that gave rise to Mr. Bailey's right to have funds credited to the DROP account occurred prior to and during the existence of the community, and not after termination." Op. at 357. The majority ignores the irrefutable fact that absent Mr. Bailey's continued work for the entire DROP period, both during and after termination of the community, there would be no increase in the DROP funds. This distinction made by the majority that Mr. Bailey was "ineligible during the DROP period for accruing additional credits toward the calculation of either base retirement benefits or possible supplemental benefits earnable [sic] upon employment after the DROP period ends," Op. at 356, is not relevant to this discussion. Since DROP is indisputable a retirement benefit which accrues only upon an employee's continued labor and efforts during his enrollment in the program and which plainly increases the total amount of regiment benefits reaped by the employee, the portion earned in the community and the entire period of the contribution should be included in the Sims calculation.
Next, I turn to the matter of partitioning this community property upon dissolution of the marital regime. While I agree that a non-employee spouse stands to receive one-half of contributions to the employee spouses' pension under Sims, I cannot agree with the majority's contention that the DROP lump sum accrues entirely during the period of "regular" employment. The majority ignores the fact that Mr. Bailey continued to work while participating in the DROP program and, in doing so, increased his total retirement package by the amount contributed to the program. The DROP lump sum increases the amount that an employee takes home upon termination of employment and, thus, his eventual total amount of retirement benefits increases.
The majority would have us reduce the Sims denominator by the number of years Mr. Bailey was involved in DROP, artificially inflating Mrs. Bailey's portion of the retirement pension. Such a novel application of Sims is not warranted simply because the employee opts into a retirement package such as the DROP program. Had Mr. Bailey not opted for DROP but rather continued under LASERS we would not have discounted any of his non-community employment tenure in applying the Sims calculation. Likewise, we would not differentiate in a case where the retirement package is entirely a lump sum. There is no reason to treat this retirement differently because it is a combination of both. The retirement package from this employer should be viewed in its entirety and should not be dissected into two retirement packages due to a fictitious retirement.[3]
*362 Thus, properly applying Sims, to ascertain the community portion of both the LASERS and DROP retirement accounts, we should divide the years of service during the existence of the community, including the time in the DROP program in which he was married to Mrs. Bailey, by the total years of service, including the full three years of DROP time. Half of that figure will be Mrs. Bailey's percentage of both the annuity and lump sum.
Additionally, the majority's holding will act to penalize future non-employee spouses who marry during the DROP period because it would bar them from ownership of any portion of the employee spouse's lump sum retirement payment because such a payment would be deemed to be earned entirely prior to the marriage. Such a result is, of course, antithetical to the tenet of community property law whereby property acquired during the existence of the community is community in nature. La. Civ. Code art. 2338. The benefit at issue here accrues on a monthly basis depending on the employee spouse's continuing efforts. If the employee is married, these efforts are community in nature.
Furthermore, La.R.S. 11:450(B) provides that in instances where an employee exits the DROP program and continues working, his retirement plan reverts back to the regular LASERS plan and the DROP lump sum will not be disbursed until actual termination. Certainly the majority would not discount the "DROP years" where the community existed prior to, during, and beyond the DROP period.
For the foregoing reasons, I would find that the lower courts and the parties' stipulation agreement regarding the apportionment of Mr. Bailey's retirement benefits should be vacated and the Sims computation should be properly applied using Mr. Bailey's entire pension attributable to total service as the denominator.
NOTES
[*] Knoll, J., not on panel, recused. Rule IV, Part II, § 3.
[1] The Sims formula stipulated to by the parties properly apportioned the years of the employee spouse's employment and the years of the existence of the community, as of the date that Mr. Bailey entered the DROP program.
[2] The dissenter focuses on the employee spouse's having to commit to complete the DROP program as a requirement for entering the program (although that requirement was not in effect when Mr. Bailey entered the program). The significant requirement for entering DROP is the employee spouse's employment for the period necessary to be eligible for retirement. The minor additional "requirement" of the commitment to complete DROP has little to do with the employment (and retirement contributions) on which the DROP benefits are calculated (and fixed as of the time of entry into DROP, regardless of whether the employee completes DROP). Moreover, there is little unfairness to a new spouse who marries the employee during his or her participation in DROP. During that period, the employee is ineligible to earn retirement credits with LASERS, who considers the employee to be retired, and the new spouse receives the same treatment as the employee spouse.
[3] This amount is also the amount of base monthly benefits the employee is to receive upon actual retirement, subject to supplementation by supplemental retirement benefits earned after participation in DROP.
[4] Our analysis in this case is similar to the situation that would have prevailed if Mr. Bailey had actually retired and accepted other employment for three years with wages equivalent to his state salary. Mrs. Bailey would be entitled to her Sims formula percentage of Mr. Bailey's monthly retirement benefits, but not to any part of any retirement benefits earned by Mr. Bailey in the new employment after the termination of the community.
[1] At the time Mr. Bailey entered into DROP in October 1993, there was no restriction on his ability to withdraw from DROP. The statute in 1993 merely stated that once an employee decided on a specific time period for participation in the DROP program (at that time not more than two years) that time period could not be extended. In 1993, revised statute 11:447(C) read "An election to participate in the plan may be made only once, for a specified period not to exceed two years. Once specified, the period of participation may not be extended." Therefore, Mr. Bailey was at liberty to withdraw from DROP the day after the divorce. It was only after Act 1110 of 1995 that R.S. 11:447(C) was amended to state in part that "A member participating in the plan may not terminate participation prior to the end of the selected duration without terminating employment."
[1] La.R.S. 11:449(B) and (C) provide that upon termination of participation funds remaining in the DROP account accrue annual growth much the same as a mutual fund.
[2] The majority in footnote 2, Op. at 357, misrepresents that this dissent "focus[es] on the employee spouse's having to commit to complete the DROP program as a requirement for entering the program." Any employee plainly must continue to work during the DROP period in order to accrue DROP account increases. There is absolutely no commitment or minimum participation requirement once participation is elected. If an employee leaves his job, DROP accrual ends and retirement payments begin. If the employee continues to work, the length of participation is a maximum of three years with absolutely no obligation to remain for the entire three years. The employee may, in fact, continue working after terminating his DROP participation and resume regular retirement pension contributions for the rest of his service life.
[3] Notably, the majority also characterizes entry into the DROP program as a "fictitious retirement" prior to holding that it is an actual retirement.